Labauve, J.
The plaintiff alleges, in substance, that she intermarried with George Ralston on the 7th day of July, 1852, and that after her said marriage, petitioner and her said husband settled, and became domiciliated in the parish of Concordia where they have ever since claimed their residence. That petitioner has large claims against her said husband for money received by him during their marriage, from her father, *313 John A. Sanderson, and from his estate, which sums were the separate and paraphernal property of petitioner; that in the month of March, 1855, petitioner’s said father gave the said Ralston for petitioner $1,000; that after the death of her said father, in making a partition between petitioner and her co-heirs, the latter, besides the other property, to-wit: the Waverly plantation in said parish, allotted to petitioner by said partition, became indebted to her in the sum of $60,437 91; that of this sum, $4,000 was paid on the day the act was passed, to-wit: the 8th February, 1856, and the balance, together with the accumulated interest, was paid as follows: On the 21st March, 1856, $23,597 18, with the interest; on the same day $1,000, also with the interest, and on the loth October, 1856, $12,865 22, also with the interest; and that he also received on the 21stMarch,1856, in her own right $20,000, her paraphernal money, coming from the estate of her father; that said last-named amounts were received from petitioner’s mother, Elizabeth Sanderson, who was administratrix of the estate of John A. Sanderson, deceased, in the State of Mississippi, and also in this State, as will appear by her accounts of administration, filed in the State of Misssissippi. She alleges that her husband’s affair's are so deranged that she believes his estate will not be sufficient to satisfy her claims, which her said husband received and appropriated to his own use.
She prays accordingly for a judgment against her said husband, and for a mortgage upon his property.
In a supplemental petition, she claims the further amounts as having been received by her said husband from her said father’s estate: On the 7th April, 1856, $665 90; on the 11th June, 1857, $5,612 77; on the 29th April, 1856, $15,000, and on the 3d May, 1856, $523 09.
| John Watt & Go. intervened in this suit, alleging their residence in New Orleans, where they were doing business as commercial partners, and to be creditors of said George Ralston in the sum of $33,349 12, with interest, as holders of four promissory notes, executed by the said Ral-ston; that they have lately commenced suit in parish of Tensas to enforce their claims, where his principal property is situated, consisting in a plantation, for the use of which the said indebtedness was contracted, they being his factors and commission merchants; that said Mrs. Ralston has no rights or claims of any kind upon her husband’s property in Louisiana; that said Ralston and wife were married in the State of Mississippi, where they have before and ever since resided and had their domicil.
They pray to be permitted to intervene in this suit, and that plaintiff’s demand be rejected at her costs, and for general relief.
Judgment having been rendered below in favor of plaintiff and rejecting the intervention, the intervenors took this appeal.
The claims of the plaintiff, charged as having accrued to her, and been received by her husband from the estate of her father, in the State of Mississippi, are not disputed; but it is denied that she has any right or mortgage upon her husband’s property in Louisiana, on the ground that said Ralston and wife were before their marriage and ever since residents of the State of Mississippi.
Neither the claims of the intervenors are disputed,
*314 The whole case then involves but one question: that .of domicil aa regards Ralston and wife.
The plaintiff’s claims being founded on the laws of Louisiana, it is incumbent on her to establish clearly that her husband’s domicil was in this State at the time he received her funds as alleged in the petition.
“ The domicil of each citizen in the parish wherein his principal establishment is selected. ”
“ The principal establishment is that in which he makes his habitual residence.” O. 0., Art. 42.
A man’s domicil is his house, where he establishes his household, and surrounds himself with the apparatus 'and comfort of life. Tanner v. King, 11 L. 178; see also Cole v. Lucas, 2 A. 946. 7 A. 395. 9 A. 165.
The testimony shows that said George Ralston was from Philadelphia, where he was raised, and came to the parish of Concordia in the spring of 1841, where he resided as his home, on the Frogmore place, belonging to his uncle by marriage, John F. Gillespie, to the end of 1843, or commencement of 1844; in the meantime he had entered, under the right of pre-emption, a piece of public land which he sold to his said uncle; he left this place and went to Natchez; afterwards, in 1845 or 1846, he went to Philadelphia.
The witness who testified here, says that next- time he saw him was just before or just after his marriage; he thinks it was just after. “I was frequently in Natchez, between 1844 and 1852, many times in each year. I have been a resident of this parish a little over thirty years. I resided about four hundred yards from the Frogmore plantation.
If Mr. Ralston had resided at Frogmore at any time between 1844 and 1852, I think I should have known it. ”
The next thing that is seen of George Ralston in the parish of Concordia is, that after his marriage, say 7th July, 1852, and before the death of his father-in-law, who died in the fall of 1855, he was residing with his wife on the Waverly plantation, then belonging to his said father-in-law.
When Ralston left the plantation called Frogmore, belonging to his Uncle Gillespie, in the parish of Concordia, at the end ,of 1843 or commencement of 1844, nothing in the record shows that anything remained behind him which would excite his interest, desire or thoughts, to return to that parish. He went to Natchez, afterwards to Philadelphia, and returned not to Conc®rdia but to Natchez, where he married on the 7th July, 1852; after his marriage, as we have seen, he went with his wife on the Waverly plantation in Concordia, then belonging to his father-in-law. In the interval of over eight years, between his former residence on the Frogmore plantation and his new residence on the Waverly plantation, it is not pretended nor proved that he actually resided in that parish, or had property or interest therein.
But it is contended, and it is true, that he had resided in said parish, on Frogmore plantation, a sufficient length of time to acquire a domicil which he could not lose until he had acquired another. The answer is, that he absented himself from the State for more than ninety days, and that domicil not' being preserved as prescribed by law in such cases, this acquired residence was interrupted. Constitution of 1845, Arts. 10 and *315 11. For lie was not a housekeeper, nor did he occupy a tenement for carrying on business; he was staying at his Uncle Gillespie’s. Besides, the right reserved to a voter, on removing from one parish to another, to vote in the former parish until he has acquired a residence in the latter, applies to the removal from one parish to another within the State. Ralston left the State. Constitution of 1852, Art. 10.
Ralston married in Adams county, in the State of Mississippi, and gave his marriage bond as a resident of that State, and the presumption is that he was a citizen thereof.
We must now inquire whether or not he became a resident of the State of Louisiana subsequent to his marriage.
After their marriage, and before the death of plaintiff’s father, Ralston and wife went on Waverly plantation, in Concordia, and belonging to said Dr. Sanderson. They stayed there one year or more. This place being believed to be unwholesome to Mrs. Ralston, her father gave her a house near Natchez, with the usual convenience and comfort, indicating that the occupants were persons of fortune, and to which place Ralston and his wife removed, and have ever since resided in that house. I't is not shown when this residence on the Waverly plantation took place, and whether it was intended as a permanent or a temporary one. This plantation was not Ralston’s property, but belonged to his father-in-law.
To acquire domicil, the fact and intention must combine.' Ralston has himself shown his intention by his own declarations in public acts. We must bear in mind that this residence was between the marriage of these parties and the death of the wife’s father.
In two public acts relating to the estate of the father, deceased, one passed in Natchez on the 7th February, 1856, and the other in Louisiana, Concordia parish, on the 8th February, 1856, and in another public act of sale passed in Tensas, on tho 5th March, 1857, the said Ralston and wife are declared to be residents of the State of Mississippi. This series of repeated declarations cannot be casual or accidental, when they are supported by facts and circumstances. Were it an isolated act, contradicted by other acts of the party, it might be recognized as an error.
We do not attach much importance to Ralston’s acceptance of the appointment by Governor Wells, as a member of the police jury for Concordia in 1865, neither to his voting in May, 1866, nor to his declaration in an act of sale passed 2d November, 1865, that he was a resident of Concordia. The motives and purposes are clearly shown, and indicated by what has transpired since. Besides, this could not change his domicil from Mississippi to Louisiana; he still resided in the former State with his family, and retained his domicil therein. It is proper to remark that this property, given as a residence to Ralston and wife, and on which they have ever since resided, became the property of Mrs. Ralston in the partition of the estate of her father, made in 1856.
Upon the whole, we are of opinion that the domicil of George Ralston and wife was always in the State of Mississippi, and that the said plaintiff has no right of action against her husband in the present suit.'
It is therefore ordered, adjudged and decreed that the judgment appealed from be annulled and avoided. It is further ordered and decreed that the intervention be sustained, and that said plaintiff’s demand be rejected, and that she pay costs in both courts.
*316 Petition for a Rehearing, by appellee. — These judgments, if they should become final, will doom to a life of penury a lady who was born to afilience.
Appalling as this result may be to their client, the habitual respect which the undersigned entertain for the judgments of your honors would deter them from the present application, were they not impressed with a profound conviction that there are two sufficient grounds upon which a reconsideration of the cases should, and will be awarded.
1. Because the leading facts, arguments and authorities upon which they relied to show that Geo. Ralston’s domicil was in Louisiana, and which do show it, have been accidentally overlooked, and passed in silence by the Court.
2. Because, irrespective of the question of domicil, the judgment of the Court goes beyond the case, and precludes forever, without any fault of hers, the unquestionable right of Mrs. Ralston to a dissolution of the community, and to a personal judgment against her husband, which right still subsists, even if he were a citizen of Mississippi.
We doubt not that the desire to dispense impartial justice, which ever prevails in this court as its ruling principle, will secure from each member a patient perusal of our views upon both these points.
I. — From the year 1812 until now, it has been imposed upon judges, asa constitutional duty, “in all cases to adduce the reasons on which their judgment is founded;” not simply to adduce a reason, or some reasons, but the identical reasons which compel che judgment. It would therefore be disrespectful to this Court to imagine that any other reasons than those set forth in their pronounced opinion influenced, in the slightest degree, the judgments in these cases. We then proceed, respectfully, to show that important, and, as we think, controlling facts, arguments and authorities adduced on behalf of Mr. and Mrs. Ralston, have, by some accident, entirely escaped the notice of the Court.
The opinion ignores the fact, that upon their marriage Ralston and wife were “established” by Dr. Sanderson at theWaverly plantation, in Concordia parish, in a furnEhed house, where they both lived continuously for more than a year; and that to “establish,” according to Webster, means as its first definition, “to set and fix firmly or unalterably; to settle permanently.”
The opinion ignores the argument and legal inference, that this “establishment” of the newly married couple in Louisiana, and their both continuing to live there more than one year, gave George Ralston necessarily a Louisiana domicil, whether he ever had one before or ndt; and that this domicil could not have been changed from Louisiana to Mississippi, unless he afterwards removed to Mississippi in fact, with the intention of making that State his durable home, and abandoning his Louisiana domicil.
The opinion ignores the pregnant fact, that so far from displaying any design thus to abandon the domicil he had undoubtedly acquired in Louisiana by this “establishment” and subsequent residence, George Ralston continuously, and by acts of public notoriety, which are not even alluded to by the Court, manifest the design and intention of retaining that domicil, by “spending the greater part of his time in Louisiana;” by serving on the grand jury of Concordia parish, which he is proved to have done before the war, and before the indebtedness to Watt & Co. existed; by serving frequently on juries in Concordia, in which capacity he was often seen acting by intervenors’ witness, Shaw; by voting at elections in Concordia parish before as well as since the war; by having his sole property and business in Louisiana, by refusing to serve on juries in Mississippi, where the question was judicially investigated, and his right to exemption on the ground of his Louisiana domicil judicially accorded in the very midst of his neighbors, where his outgoings and b'comnms were best known. Sui ely facts like these, if they had been remembered by the Court, would not have passed unmentioned *317 in that summing up of reasons pro and con, which constitutes a, judicial opinion on a contested question of domicil.
The opinion states, that though Ralston had disappeared for about six or eight years, yet from his appearance and marriage in 1852, m Adams county, Miss., and his giving a marriage bond as a resident of that State, “ the presumption is that he was a citizen thereof.” If this be1 so, i't'is'a much easier thing to prove that one man is a citizen of Mississippi than that another is a citizen of Louisiana.
If those comparatively irrelevant circumstances raise a “presumption ” of Mississippi citizenship, why should not the pertinent and weighty fact's just detailed prove positively a Louisiana citizenship? the joint establishment of the married pair in Louisiana; the sole business and internist of the husband being there, where he has always spent the greatest portion of his time; his serving on grand juries and on petty juries continuously in Louisiana; his voting constantly there; his exelcisihg none of these sacred rights or duties of citizenship elsewhere) and his positive exemption from these duties in Mississippi, upon the question being there raised.
Facts of this character we find dwelt upon habitually in the judicial reports of all countries as important, and controlling in questions' of domicil, while we have yet to see a case where it was finally decided that the place of marriage is presumed to be the husband’s domicil, or that a description, by a deputy clerk, in a $200 marriage bond of “A. B. principal and C. D. surety, of the county of-,” which the bridegroom seldom, if ever reads, should determine so grave a question. In the first case, the bridegroom usually goes to the bride’s domicil to be married, and when the rites are solemnized his domicil becomes hers'ipso jure; and in the second case, it is the domicil of the surety only which is described, for he only is required to be a resident of the place where the license is issued, and the residence of the bridegroom is utterly irrelevent and never thought of.
Not only have these facts and arguments been ignored, but all the authorities we cited also. Declarations in three acts, not one of which was written by Ralston, and in none of which was his residence a matter of the slightest consequence, are treated as controlling, and the authority of New Orleans v. Sheppard, 10 A. 268, and Hill v. Spangenberg, 4 A. 553, practically overruled sub silentio. These uncalled for declarations, written by third persons, where numerous parties really residing’in Mississippi were lumped together with Ralston, and Ms residence was immaterial, are here treated as decisive, and the habitual voting and other acts arid services of the party himself, directly involving the highest rates of citizenship are treated as so trivial as to be unworthy of a passing mentiori, when the Court in 4 An., page 553, under like circumstances, solemnly decided that “as to the comparative weight of this evidence, (a declaration in a notarial act), it may be considered as inferior to another implied declaration of the defendant on the subject of his domicil. The recital in the notarial act was immaterial, and may have been in reality the act of the notary, and not suggested by the defendant, nor noticed by him; but Ms voting in the parish of Jefferson was his own deliberate act, clearly implying a declaration that he resided in that parish, and involving a fraud upon the public, if that declaration was untrue.”
The cases of Shelton v. Tiffen, 6 How. 185, and Guier v. O'Daniel, 1 Binney, 354 note, bearing directly and intimately on the vital questions in this case, are also unnoticed by the Court. It is twice repeated in the opinion, that Waverly belonged to Dr. Sanderson, and at the end the Court say: It is proper to remark that the property near Natchez, given as a residence to Ralston and wife, became the property of Mrs. Ralston in the partition of the estate of her father, made in 1856.
It seems to us that it would have been equally proper to remark that Waverly, upon which Dr. Sanderson established Ralston and his wife, wlmre they both lived for more than a y a-, a d where Ralston continued to Live, as is sworn by many witnesses, till it was recently sold, also be *318 came the property of Mrs. Balston in the partition of the estate of the father, made in 1856, and that not by lot, but by the voluntary agreement of the widow and all the heirs, furnishing a fair presumption that this was in pursuance of the common understanding at the time of the original establishment of Balston and wife there.
The only facts the Court does mention out of the great array adduced on our side, are summed up in this laconic sentence: “We do not attach much importance to Balston’s acceptance of the appointment by Gov. Wells, as a member of the police jury for Concordia, in 1865, neither to his voting in May, 1866, nor to his declaration in an act of sale passed November 2, 1865, that he was a resident of Concordia. The motives and purposes are clearly shown and indicated by what has transpired since.
We respectfully protest, that in the face of the unnoticed facts and acts and declarations of Balston, running back to the year 1852, this reflection upon his motives, adopted from the arguments for interven ors, is inconsistent with the evidence on the record, and therefore unmeritc-d.
Balston and wife were not established on Waverly just after their marriage in 1852, to evade a debt to Watt & Co., that was not created till 1862 and 1865! Not for that purpose did they live there together more than a year after settling there! Not for that purpose did Balsion continue to reside there till the war and after the war! Not for that purpose did he serve in Concordia on petit juries before the. war, and on the grand jury in 1860! Not for that purpose aid he vote there up to the time of the war as well as afterwards! The three circumstances selected by the Court, from the mass of our evidence, were not relied upon as in themselves sufficient. They only prove the consistent carrying out of Balston’s purpose and conduct as a citizen of Louisiana, ever since his marriage, and at periods entirely free from suspicion. Why s' cuM those pre-existent facts be ignored? They would, if noticed, desticy cur vestige of ground for even a suspicion of Balston’s motive.,, and the injustice unintentionally done him by their omission, is itself, we humbly submit,-a sufficient reason for a rehearing.
II. — But the judgments, so far as they affect Mrs. Balston’s claims against her husband are erroneous, for the further reason, that her petition is rejected in tolo, and barred in all its manifold branches by a res judicata. The Court must have overlooked the injustice of this decree. On the front page of the record, No. 1215, is pasted the written admission of intervenor’s counsel, that “the amount for which judgment is rendered in this case is fully supported by the evidence.” That amount exceeds $80,000. Yet, for this large sum all claim against her husband is barred! A claim that is indisputable, though without mortgage, even if it were true that both spouses had always resided in Mississippi! It has been so adjudged by this Court. In Arnold v. McBride, 6 A. 703, the very case was decided in regard to Mississippians; it was held, and the law is there guoted, that the wife had a valid claim in Louisiana to a personal judgment against her husband for moneys inherited from her father’s estate, whilst all parties were domiciled in Mississippi, but that the law of Louisiana would not superadd a mortgage to the claim, inasmuch as no mortgage existed in Mississippi. But this unhappy lady is cut off by the Court from any recourse whatever, even as a personal creditor of her husband.
Again: By our law of March 18th, 1852, adopted before their marriage, Balston and wife, even if they were non-residents, fell under the community regime, as to Louisiana property. The disorder of Balston’s affairs is proven and admitted. She prayed for a dissolution of the community, and the right to administer separately her own affairs in Louisiana, and both were accorded in the decree, which your honors reverse. At one blow her right to this double relief is also forever barred!
Mrs. Balston could not have conscientiously alleged her husband to be a Mississippian when she knew he was not; and when he had for so many years been in possession of the undisputed status of a citizen of Louisi *319 ana; recognized uniformly as such, from 1852 until now, by her judges, her sheriffs, her clerks, her jurors, grand and petty, her police jurors, her commissioners of elections, and her governor. Not only so, but she knew that Mississippi, through her courts, had treated him as a citizen of Louisiana. It is difficult to depict the surprise which overwhelms her upon finding him now, for the first time, at a place remote from his haunts, and by a tribunal that, according to its reasons for judgment, would seem to know little or nothing of these important facts, rejected as a Xjouisianian, and declared to be a Mississippian! If the courts of Mississippi and this Court both decide correctly, he is a citizen without a country, a head of a family without a domicil, a man without a home! To what hospitable shore shall he flee?
It is respectfully submitted, that if there be a conflict of testimony this Court should lean in favor of that view which will maintain the status hitherto accorded to Balston by the various courts, public officers, and citizens of Louisiana, as well as by the courts of Mississippi.
These considerations are deferentially but earnestly laid before the Court. It is not strange that many of them, though urged before, failed to attract any attention. Three months, lacking six days, intervened between the oral argument and the rendition of the judgments under review.
In that long interval, questions “of great pith and moment” have exercised, and sometimes divided the Court. Full well do we know what ill-requited toils fall to the lot of this Bench. But equally well do we know that one of its highest pleasures as well as one of its noblest duties, is to avail itself of that wise provision of our laws, which grants a delay after judgment pronounced, purposely to afford the opportunity to correct an oversight or retrieve an error. The end and object of all laws, forms of procedure and tribunals, is but the administration of justice.
Both eases have been treated together by the Court, and the reasons for judgment in one referred to as the main reasons for judgment in the other. For the causes hereinbefore assigned, we pray that a rehearing be granted in both cases.